VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.     26-AP-062



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JULY TERM,   2026

| | |
|---|---|
| In re L.H., Juvenile<br>(K.M., Mother\*) | } APPEALED FROM:<br>}<br>} Superior Court, Chittenden Unit,<br>} Family Division<br>} CASE NO. 24-JV-00357<br>Trial Judge: Laura C. Rowntree |

In the above-entitled cause, the Clerk will enter:

Mother appeals from the family division's order terminating her parental rights to L.H. at initial disposition.  We affirm.

L.H. was born in 2014 and is nearly twelve years old.  In March 2024, the State filed a petition alleging that L.H. was a child in need of care or supervision (CHINS) because he was exposed to substance abuse and domestic violence in mother's care, was left unsupervised for extended periods of time, and had untreated medical issues.  The petition further alleged that mother had pending criminal charges and was facing eviction.  This was the third CHINS petition involving L.H.  The court transferred custody of L.H. to the Department for Children and Families (DCF) in emergency and temporary care orders.  L.H. was placed in the care of his maternal grandparents, with whom he lived throughout this proceeding.

At the merits hearing in November 2024, the court found by clear and convincing evidence that at the time of the petition, L.H. was living with mother and her male partner D.S.  D.S. had been convicted of assaulting mother and he and mother had a history of domestic violence, which L.H. had witnessed.  Mother and D.S. used drugs and appeared to engage in drug trafficking.  Mother often left L.H. with her parents to focus on D.S. and his problems and engage in illegal activities.  L.H. had access to drug paraphernalia, including a drug syringe that was in an overnight bag mother packed for him and a pipe in the home, and was exposed to drug use.  There was rotting meat and trash throughout mother's home.  L.H. experienced medical neglect when mother ignored his serious ear infections.  The court found that L.H. was unsafe in mother's care.

In January 2025, DCF filed a disposition case plan recommending a permanency goal of adoption, as well as a petition to terminate mother's parental rights.  The final hearing took place

over three days in May, June, and October 2025. Mother appeared and testified on the first day, attempted unsuccessfully to participate remotely on the second day, and appeared remotely on the third day an hour after the proceeding began despite being ordered to appear in person.[*] The court subsequently issued an order making the following findings by clear and convincing evidence.

After L.H. entered DCF custody, he resisted having contact with mother. With support from DCF and grandparents, L.H. began having weekly telephone calls with mother in May 2024. From August 2024 onward, mother's telephone contact with L.H. became increasingly irregular.

In July 2024, grandfather brought L.H. to downtown Burlington where mother was living in a homeless encampment. When they arrived, mother's partner D.S. was present. The area around mother's tent was littered with drug paraphernalia including needles, which L.H. attempted to clean up. Since that visit, L.H. had only seen mother in person twice, in the spring and fall of 2025. Both visits occurred in Albany, New York, where mother moved in the summer of 2024 to look for work.

In November 2024, mother was incarcerated in New York for petit larceny. After she was released in January 2025, she entered a transitional housing program operated by Addiction Care Center of Albany. Mother engaged in substance-use and mental-health treatment through that program. She had not engaged in any treatment for domestic violence or trauma.

Mother executed a release so DCF could monitor her progress at the Albany program. She testified in May 2025 that she had been sober for four months. However, DCF subsequently received records showing that in April 2025, mother relapsed on cocaine and had been placed on restricted status. By September 2025, the program reported to DCF that mother was meeting expectations, providing urinalysis, and engaged in counseling.

In June 2025, mother moved to a residence that houses women in recovery. She continued to live there at the time of the October 2025 hearing. She worked five evenings a week as a cleaner at a psychiatric facility. She walked or rode the bus to work because she had surrendered her driver's license. Her residence permitted children, but mother testified she did not want L.H. to return to her care until she found an apartment. Mother was four months pregnant at the time of the October hearing.

From November 2024 to March 2025, mother had little to no contact with L.H. or DCF. In March 2025, DCF reinstated weekly check-ins and monthly shared parenting meetings. Mother consistently attended the monthly meetings and engaged in the weekly check-ins about half of the time.

Mother had pending Vermont criminal charges for disorderly conduct, hindering arrest, possession of cocaine, and driving under the influence. At the second day of hearing, the court ordered mother to appear in person for the last day and informed her that she would have an opportunity to resolve her active arrest warrants. However, mother refused to return to Vermont. Mother also had several pending criminal charges in Massachusetts and an outstanding judgment of $13,000 from her 2024 eviction proceeding.

---

[*] Mother did not appear for the temporary-care or merits hearings.

Grandparents were meeting L.H.'s medical and dental needs. L.H. was seeing a therapist and a school-based counselor and had an individualized education plan. Mother was not aware of what services L.H. received in school. She admitted that she had not attempted to contact L.H.'s school or other providers.

The court analyzed the factors set forth in 33 V.S.A. § 5114(a). It found that L.H. loved mother but that his most stable relationship was with grandparents. They met his needs, provided him with a safe home, and worked with providers to support him, while also facilitating his relationship with mother. In their care, L.H.'s behavioral issues had lessened, and he required fewer interventions at school. L.H. had stable connections with his school and peers and his current medical and mental-health providers. The court found that mother did not demonstrate an understanding of how her relationship with D.S., substance use, extended absences, and inconsistent contact had impacted L.H. Mother blamed others for her behavior and minimized the effects of her choices on L.H. The court found that mother had not played a constructive role in L.H.'s life. It further found that mother would not be able to resume parental duties within a reasonable time. She had taken no significant steps toward reunification since becoming sober. She did not demonstrate an understanding of L.H.'s medical or mental-health needs or know who L.H.'s providers were and did not know where he would attend school if he lived with her. She had not addressed her active warrants or the eviction judgment, and it was possible that she could be reincarcerated on pending charges. She had also not addressed many of the issues that led to L.H. entering custody, including domestic violence and trauma. The court found that L.H. was still young and needed permanency, and "there are simply too many unknown variables to conclude that mother will be able to resume parental responsibilities for [L.H.] within a reasonable timeframe." For these reasons, the court concluded that termination was in L.H.'s best interests.

On appeal, mother argues that the trial court erred in terminating her rights at initial disposition where the evidence showed that her living situation had improved significantly and she was sober and able to care for L.H. The family division may terminate parental rights at initial disposition if it finds by clear and convincing evidence that termination is in the child's best interests after weighing the four factors set forth in 33 V.S.A. § 5114(a). In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29; see also 33 V.S.A. § 5318(a)(5) (providing that court may terminate parental rights at initial disposition). The third factor, "the likelihood that the parent will be able to resume parental duties within a reasonable time," is the most important. In re J.B., 167 Vt. 637, 639 (1998) (mem.). "The reasonableness of the time period is measured from the perspective of the child's needs and may take account of the child's young age or special needs." In re C.P., 2012 VT 100, ¶ 30 (citations omitted). While "termination at initial disposition should be rare," it may be appropriate if there is no "reasonable possibility" that the circumstances that led to the filing of the CHINS petition "can be remedied and the family restored within a reasonable time." In re B.M., 165 Vt. 194, 199 (1996). We will affirm the court's findings unless they are clearly erroneous and will uphold its legal conclusions if supported by the findings. In re J.B., 167 Vt. at 639. "We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence." In re N.L., 2019 VT 10, ¶ 9, 209 Vt. 450 (quotation omitted).

The trial court applied the appropriate standard, and its conclusions are supported by its findings which are supported by the record. The court acknowledged mother's recent progress in achieving sobriety, engaging in substance-use and mental-health treatment, and obtaining safe housing. However, there was little indication that she would be able to resume parenting L.H. on a full-time basis within a reasonable time as measured from L.H.'s perspective. DCF had been

involved with the family since 2014 and L.H. had been in custody for eighteen months at the time of the final hearing. Mother was completely absent from his life for a significant portion of that time and had only seen him in person twice since July 2024. Her refusal to return to Vermont to resolve her criminal charges weakened her bond with L.H. She did not know his current medical or mental-health needs and had made no effort to contact his school or providers to obtain information. She stated at the hearing that she felt it would be best for L.H. to remain in grandparents' care until she found an apartment in New York and did not want to make him change schools during the school year. She agreed at the hearing that this meant it would be at least eight months until they could reunify. Mother was also expecting another child and had unresolved criminal charges that could lead to her reincarceration. The court did not err in concluding based on these facts that mother would not be able to resume parenting L.H. within a reasonable time. See In re B.M., 165 Vt. 331, 342 (1996) (explaining that father's recent progress in improving his own life did not preclude termination of parental rights because focus was on his ability to parent, and father lacked strong bond with daughter and failed to play caregiving role early in her life).

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
Michael P. Drescher, Associate Justice